# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KIMBERLEY D. SPRINGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13-CV-628-PJC |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff, Kimberley D. Springer ("Springer"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Springer's application for disability insurance benefits pursuant to the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be taken directly to the Tenth Circuit Court of Appeals. Springer appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Springer was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

## Claimant's Background[1]

Springer was 46 years old at the time of the hearing before the ALJ on October 20, 2011. (R. 47). She testified that she had worked in November and December 2010 making necklaces and selling them at a craft fair. (R. 50). She said that she found it stressful and that she did not interact well with the customers. *Id.*

When asked why she was unable to work, Springer said that she had problems finding her words and getting distracted. (R. 51). She said that she had trouble sleeping due to restless leg syndrome and that she was exhausted during the day. (R. 55). She took a two-hour nap about three or four days a week. *Id.* Springer said that when she was attempting to complete a task, she would get distracted, and it would take longer for her to finish it. (R. 56-57).

Springer thought that some of her medications for her physical medical problems might exacerbate her cognitive issues. (R. 59). She was taking medication for depression and anxiety. *Id.* Even with her medications, she was still depressed. (R. 60). She said that, due to her depression, she was not able to do tasks even when she knew she needed to do them. *Id.* When asked for an example of work-related stress, Springer said that if she was interrupted while doing a task such as counting the cash drawer it would irritate her "really bad" and she would have an outburst. (R. 60-61).

---

[1] Springer's only issue on appeal is whether the ALJ properly evaluated the opinion evidence of the agency mental examining consultant. Plaintiff's Opening Brief, Dkt. #16, p. 3. Therefore, the Court has only summarized that portion of the administrative transcript that relates to her claims of mental impairments and limitations.

Springer submitted a function report to the agency in support of her application. (R. 217-24). She described her daily activities, and she said that she had a relationship with her 22- and 17-year-old daughters that included talking and giving advice. (R. 217-18). She had to set an alarm to remind herself to take her morning medications. (R. 219). She said that she prepared lunch and dinner about four or five days a week, but it took longer because she would get sidetracked. *Id.* She said that she was not able to handle money, because she made mistakes and had to pay fees for checks written on insufficient funds. (R. 220-21). She said that she did not spend time with others and that she had trouble getting along with others. (R. 221-22). She said that being in pain and having memory problems made her angry. (R. 222). In a section of the form asking what activities were affected by her conditions, Springer checked every box. *Id.* She said that she got along "fine" with authority figures, but she came across as abrupt. (R. 223). She said that she did not handle stress or changes in routine well. *Id.* She said that crowds made her nervous. *Id.*

Springer's husband completed a third-party function report. (R. 225-32). He said that, due to sleep problems, Springer was often not in bed all night. (R. 226). He said that Springer cooked daily, but it took her twice as long as it previously had. (R. 227). He said that Springer often became impatient or angry when she had trouble completing tasks. *Id.* Springer had previously been able to handle money, but her husband said that she presently could not because she made "too many mistakes." (R. 228). He said that Springer had problems getting along with people, became angry easily, and lashed out. (R. 230). For the section of the form asking what activities were affected by her conditions, Springer's husband checked every box. *Id.* He said that Springer did not handle stress well and was not comfortable with change. (R. 231).

Springer saw Christine H. Rasmussen, Ph.D., for intake on December 31, 2009. (R. 576). A checklist described Springer's mood as sad, hopeless, and angry, with poor concentration. *Id.* Her anxiety included worrying. *Id.* Her thoughts were "distractible," and her behavior was "aggressive." *Id.* For "Target Problems/Symptoms," the form stated: "Managing moods relative to numerous chronic medical issues. Depression, anxiety, irritability, anger management, marital discord." *Id.* For expected outcome, a box was checked stating that improvement was expected, with less than normal functioning anticipated. *Id.* Dr. Rasmussen's Axis I[2] diagnosis[3] was adjustment disorder with mixed anxiety and depressed mood. She scored Springer's Global Assessment of Functioning ("GAF")[4] as 55. *Id.* Springer saw Dr. Rasmussen regularly through December 2010 with virtually the same printed form, with short hand-written comments for each visit. (R. 558-75).

---

[2] The multiaxial system "facilitates comprehensive and systematic evaluation." *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

[3] Dr. Rasmussen used numerical codes to express her diagnosis. These codes are from the International Classification of Diseases, 9th edition - Clinical Model coding system, and this is a medically-recognized ranking of diagnoses. *See Little Company of Mary Hosp. v. Shalala*, 24 F.3d 984, 986-87 (7th Cir. 1994).

[4] The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id.* at 32. The GAF scale is from 1-100. *Id.* A GAF score between 21-30 indicates "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id.* at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id. See also Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012).

Agency examining consultant Rogelio Zaragoza, M.D., completed a psychiatric evaluation of Springer on October 3, 2009. (R. 405-08). Springer's chief complaint was her multiple health issues. (R. 405). Dr. Zaragoza summarized Springer's history and said that she was cooperative and pleasant, with good eye contact. (R. 405-06). He said that Springer's thought content revolved around her multiple medical problems and unemployment. (R. 407). Springer's mood was initially anxious with a full range of affect, and Dr. Zaragoza said that Springer was "able to settle down quickly as the interview proceeded." *Id.* Springer was oriented, she had good fund of knowledge, and her memory and concentration were intact. *Id.* Her judgment and insight were fair. *Id.*

Dr. Zaragoza diagnosed Springer on Axis I with depressive disorder not otherwise specified; and cocaine abuse in remission. *Id.* He scored Springer's GAF as 50. (R. 408). Dr. Zaragoza's opinion was that Springer's condition should improve with treatment. *Id.* He said that Springer was capable of managing her own funds, and she could perform simple and repetitive tasks, detailed tasks, and complex tasks. *Id.* He said that she could not accept instructions from supervisors or interact with coworkers and the public. *Id.* He said that Springer "got fired from her job due to difficulty dealing with stress, coworkers, and irritability." *Id.* Dr. Zaragoza said that Springer could not perform work activities on a consistent basis or maintain regular attendance in the workplace. *Id.* He said that she could not complete a normal work day or work week without interruptions from her psychiatric condition. *Id.* He said that Springer was "not able to deal with the usual work-related stress at this time." *Id.*

Nonexamining agency consultant Vincent Gollogly, Ph.D., completed a Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment on October 21, 2009. (R. 431-48). On the Psychiatric Review Technique form, for Listing 12.04, Dr. Gollogly

5

noted depressive disorder not otherwise specified. (R. 438). For Listing 12.09, Dr. Gollogly noted cocaine abuse in remission. (R. 443). For the "Paragraph B Criteria,"[5] Dr. Gollogly found that Springer had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation. (R. 445).

On the Mental Residual Functional Capacity Assessment, Dr. Gollogly found that Springer was moderately limited in nine categories. (R. 431-32). In his narrative comments, Dr. Gollogly briefly summarized the mental status examination portion of Dr. Zaragoza's report. (R. 433). Based on the results of Dr. Zaragoza's examination, Dr. Gollogly said that Springer was capable of simple repetitive tasks and some detailed tasks. *Id.* Based on Springer's participation in the consultative examination, her family life, and her superficial public contact such as physical therapy and grocery shopping, Dr. Gollogly found that Springer could accept instructions from supervisors and could work with a small group of coworkers. *Id.*

## Procedural History

Springer filed her application for disability insurance benefits on July 7, 2009. (R. 159-65). Springer asserted onset of disability on March 1, 2007. (R. 159). The application was denied initially and on reconsideration. (R. 74-76, 81-82). An administrative hearing was held before ALJ Gary Elliott on October 20, 2011. (R. 43-71). By decision dated November 16,

---

[5] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

2011, the ALJ found that Springer was not disabled. (R. 24-37). On July 22, 2013, the Appeals Council denied further review. (R. 7-12). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. § 404.981.

**Social Security Law and Standard Of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[6] *See also Wall v. Astrue*, 561 F.3d 1048, 1052-53 (10th Cir. 2009) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not

---

[6] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taSpringer into account his age, education, work experience, and RFC, can perform. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

7

disabled, evaluation under a subsequent step is not necessary." *Lax*, 489 F.3d at 1084 (citation and quotation omitted).

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Wall*, 561 F.3d at 1052 (quotations and citations omitted). Although the court will not reweigh the evidence, the court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Id.*

## Decision of the Administrative Law Judge

In his decision, the ALJ found that Springer met insured status requirements through December 31, 2010. (R. 26). At Step One, the ALJ found that Springer had not engaged in any substantial gainful activity after her alleged onset date of July 1, 2009 and before her date last insured of December 31, 2010. *Id.* At Step Two, the ALJ found that Springer had severe impairments of arthralgias, depressive disorder, and obesity. *Id.* At Step Three, the ALJ found that Springer's impairments did not meet any Listing. (R. 27-29).

The ALJ found that Springer had the RFC to perform a range of work at the light exertional level. (R. 29). For mental limitations, the ALJ said that Springer was capable of unskilled work with occasional contact with coworkers but not contact with the public. *Id.* At Step Four, the ALJ determined that Springer could not return to past relevant work. (R. 35). At Step Five, the ALJ found that there were a significant number of jobs in the national economy that

8

Springer could perform, taking into account her age, education, work experience, and RFC. (R. 36). Therefore, the ALJ found that Springer was not disabled at any time from July 1, 2009, through December 31, 2010. (R. 37).

## Review

Springer makes only one argument in this proceeding. She says that the ALJ erred by failing to properly evaluate the opinions of Dr. Zaragoza, the examining agency consultant. Plaintiff's Opening Brief, Dkt. #16, p. 3. Regarding the single issue raised by Springer, the Court finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements. Thus, the ALJ's decision is **AFFIRMED**.

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). An ALJ is required to discuss all opinion evidence and to explain what weight he gives it. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ is required to consider the opinion of an examining physician and to provide specific, legitimate reasons for rejecting it. *Doyal v. Barnhart*, 331 F.3d 758, 763 (10th Cir. 2003).

The Tenth Circuit has commented on a court's role in reviewing an ALJ's discussion of opinion evidence:

> In sum, we reject [claimant's] contention that the ALJ's opinion does not adequately evaluate and discuss the medical-source evidence. Where, as here, we can follow the adjudicator's reasoning in conducting our review, and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal.

*Keyes-Zachary*, 695 F.3d at 1167.  The court also said that "common sense, not technical perfection, is [the] guide" of a reviewing court and that "[t]he more comprehensive the ALJ's explanation, the easier our task; but we cannot insist on technical perfection." *Id.* at 1166.

In Springer's case, the ALJ's discussion of the report of Dr. Zaragoza was extensive.  The ALJ cited to Dr. Zaragoza's report, Exhibit 5F, in some instances in his discussion of whether Springer's mental impairments met a Listing at Step Three.  (R. 28).  After his discussion of Springer's testimony in the main body of his decision, the ALJ summarized the objective evidence included in Dr. Zaragoza's report.  (R. 30).  After discussing other medical evidence, including the records of treating psychologist Dr. Rasmussen, the ALJ explained his reasons for finding Springer less than fully credible.  (R. 30-33).  The ALJ then discussed the opinion evidence of Dr. Gollogly.  (R. 33-34).

At this point, the ALJ summarized the opinion portion of Dr. Zaragoza's report.  (R. 34).  He said that he gave the opinions little weight, and he gave several reasons for this determination. *Id.*  First, he said that it appeared that Dr. Zaragoza's opinions were based on Springer's subjective complaints rather than the objective findings of his own examination, and the ALJ noted that he found Springer less than fully credible. *Id.*  Second, the ALJ then gave specific instances in which the opinions of Dr. Zaragoza conflicted with other evidence, beginning with the contrast between his statement that Springer could not accept instructions from supervisors and her own statement in her function report that she was "fine" with authority figures, but she came across as abrupt. *Id.*  The ALJ also cited to Dr. Zaragoza's own observation that Springer was cooperative and pleasant. *Id.*  The ALJ said that Dr. Zaragoza's opinions were in conflict with Springer's ability to go to stores, go to doctor's appointments, socialize with family, throw

parties, and go to craft fairs. *Id.* Finally, the ALJ contrasted Dr. Zaragoza's opinions with observations made by other medical providers. *Id.*

The reasons given by the ALJ for rejecting Dr. Zaragoza's opinions are legitimate and specific. *Newbold v. Colvin*, 718 F.3d 1257, 1265-66 (10th Cir. 2013). Those reasons bear similarity to the reasons of the ALJ in rejecting treating physician evidence in *Newbold*. The Tenth Circuit in *Newbold* approved the ALJ's finding that a treating physician opinion should be given diminished weight because that opinion was inconsistent with the physician's own report. *Id.* In the present case, the ALJ noted the sharp contrast between Dr. Zaragoza's largely benign objective findings and the significant limitations that he found in the opinion portion of his report. (R. 34). As was true in *Newbold*, the inconsistencies within Dr. Zaragoza's own report were a legitimate reason for giving that report little weight. Inconsistency of the physician's opinions with the claimant's reported activities of daily living and with other objective medical evidence were approved by the Tenth Circuit in *Newbold* as reasons for giving the opinions diminished weight. *Newbold*, 718 F.3d at 1265-66. These same reasons, that Dr. Zaragoza's opinions were inconsistent with Springer's reported activities of daily living and with other medical reports, were legitimate reasons here. *See also Raymond v. Astrue*, 621 F.3d 1269, 1272 (10th Cir. 2009) (affirming ALJ's rejection of treating physician opinion for multiple reasons). The ALJ had specific, legitimate reasons that were supported by substantial evidence for the weight he gave the opinion evidence of Dr. Zaragoza. *Doyal*, 331 F.3d at 764 (ALJ's rejection of examining physician opinion based on inconsistency with the evidence as a whole was proper); *Aragon v. Astrue*, 246 Fed. Appx. 546, 549-50 (10th Cir. 2007) (affirming ALJ's analysis of examining physician report).

In her arguments that the ALJ failed to properly evaluate Dr. Zaragoza's opinions, Springer first asserts that the ALJ was not allowed to give reduced weight to Dr. Zaragoza's report based on the ALJ's credibility finding, citing *McGoffin v. Barnhart*, 288 F.3d 1248 (10th Cir. 2002). The Tenth Circuit, however, has approved cases in which the ALJ had determined that physician opinion was based on a claimant's self-report and has distinguished *McGoffin*. *Boucher v. Astrue*, 371 Fed. Appx. 917, 923-24 (10th Cir. 2010) (unpublished). In *Boucher*, the ALJ found that a physician's report that the claimant would do best with part-time work was based on her self-report, which the ALJ found to be unreliable. *Id.* at 923. The Tenth Circuit approved of this reason, noting that there were no independent observations by the physician that would support the conclusion that the claimant could perform only part-time work. *Id.* The *Boucher* court affirmed and it stated that *McGoffin* was inapplicable because the ALJ in *McGoffin* had speculated that the report in question had not been authored by the physician. *Id.* at 923-24. *See also Lopez v. Barnhart*, 183 Fed. Appx. 825, 829 (10th Cir. 2006) (unpublished) (*McGoffin* "inapposite" when physician opinion at issue was "at odds with much of the record evidence"); *Butler v. Astrue*, 410 Fed. Appx. 137, 141-42 (10th Cir. 2011) (unpublished) (affirming ALJ's finding reduced weight of treating physician opinion in part because it was based on claimant's subjective reports of pain, which were found not fully credible).

*Boucher*, and its finding that *McGoffin* was not controlling, apply to Springer's case and to the ALJ's reasoning. Dr. Zaragoza specifically stated in the opinion portion of his report that Springer had been fired "due to difficulty dealing with stress, coworkers, and irritability." (R. 408). The only possible source of this statement was Springer's self-report, and the ALJ had questioned Springer's credibility on this specific point due to inconsistencies of her testimony and her function report. (R. 33). Likewise, there was nothing in the objective medical findings

12

contained in Dr. Zaragoza's report that supported his opinions that Springer could not perform work activities on a consistent basis, maintain regular attendance in the workplace, and complete a normal work day and work week without interruptions from her psychiatric symptoms. The ALJ properly found that Dr. Zaragoza's opinions were based on Springer's reported symptoms, and he made a supported finding that Springer was less than fully credible, which has not been contested by Springer in this case.

Springer also objects to what she characterizes as the ALJ's selective reliance on evidence tending to establish her social functioning without mentioning evidence to the contrary. Plaintiff's Opening Brief, Dkt. #16, p. 5. Springer cites to the familiar requirement that an ALJ "must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The evidence cited by Springer in this portion of her argument, however, is the function reports completed by Springer and her husband. Plaintiff's Opening Brief, Dkt. #16, p. 5. The function reports are hardly uncontroverted evidence, as is reflected by the ALJ's juxtaposition of statements from Springer's report with contradictory evidence. (R. 28-34). While the ALJ did not summarize the third party function report of Springer's husband in detail, he explained that it was similar, and in some respects identical, to the function report completed by Springer, and he said that the limitations included in the report were not supported by the record. (R. 33). This is not the kind of selective recitation of the evidence addressed by *Clifton*. *See, e.g., Conger v. Astrue*, 453 Fed. Appx. 821, 826 (10th Cir. 2011) (unpublished) (ALJ did not err by failing to specifically explain in RFC determination why he did not credit claimant's testimony on limitations when ALJ made a supported adverse credibility assessment).

Springer also complains that the ALJ "apparently disregarded" aspects of Dr. Zaragoza's report that tended to support her claim, such as her thought content focused on her physical health problems, her initially anxious mood, the mistakes she made in performing serial sevens, and the results of abstract thinking questions. Plaintiff's Opening Brief, Dkt. #16, p. 5. Springer makes the same complaint regarding some of the evidence found in Dr. Rasmussen's treating records. *Id.* at 5-6. She acknowledges, however, that the ALJ recited most of this evidence, both from Dr. Zaragoza's report and from Dr. Rasmussen's records, in his decision. *Id.* at 6. She complains, however, that the ALJ did not explain "why this evidence became unimportant when evaluating Dr. Zaragoza's opinions." *Id.*

In this complaint, Springer misunderstands the requirements of the ALJ's decision. The ALJ must discuss the medical evidence in a sufficiently even-handed way, as *Clifton* explains. The ALJ must then give specific and supported reasons for his findings. Here, the finding contested by Springer is the ALJ's finding that Dr. Zaragoza's opinions should be rejected. The ALJ gave specific and legitimate reasons for this finding, as explained above. The ALJ, in making a finding such as this one, does not have to recite every piece of contrary evidence and discredit it, so long as it is clear that it has been considered. *Keyes-Zachary*, 695 F.3d 1156, 1165-66 (10th Cir. 2012) (rejecting claimant's argument that the ALJ had insufficiently considered some evidence); *Luttrell v. Astrue*, 453 Fed. Appx. 786, 792 (10th Cir. 2011) (unpublished) (ALJ's failure to explain why he disregarded GAF scores did not require reversal); *Stokes v. Astrue*, 274 Fed. Appx. 675, 686 (10th Cir. 2008) (unpublished) ("certain pieces of favorable evidence" cited by claimant did not require reversal of credibility finding).

The question the Court must decide is whether the decision of the ALJ is supported by substantial evidence.

> The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. We may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.

*Cowan v. Astrue*, 552 F.3d 1182, 1185 (10th Cir. 2008) (further quotation omitted). Here, even if the evidence was susceptible to a conclusion in favor of finding Springer to be disabled, that possibility would not mean that the ALJ's conclusion of nondisability is lacking support by substantial evidence. The undersigned finds that there was substantial evidence supporting the ALJ's finding that the opinions of Dr. Zaragoza should be given little weight.

## Conclusion

The decision of the Commissioner is supported by substantial evidence and complies with legal requirements. The decision is **AFFIRMED**.

Dated this 11th day of December 2014.

_____
Paul J. Cleary
United States Magistrate Judge